IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>JORGE LUIS LEAL,<br>Defendant. | Case No. 19–CR–40069–JPG |

## **MEMORANDUM & ORDER**

Before the Court is Defendant Jorge Luis Leal's Motion to Suppress Statements. (ECF No. 51). The Government responded, (ECF No. 55); Leal replied, (ECF No. 56); and the Court conducted a hearing on August 19, 2020, (ECF No. 70). For the reasons below, the Court **GRANTS** Leal's Motion to Suppress Statements.

### I.  PROCEDURAL & FACTUAL HISTORY

In July 2019, Leal unwittingly contacted an undercover FBI agent on a cellphone application geared toward the LGBTQ community.[1] The agent informed Leal that he was a 15-year-old boy. Although Leal hesitated briefly, the two continued engaging in sexually explicit conversations. The agent then sent Leal the address to his "home," where Leal hoped to receive oral sex.

When Leal arrived, he asked the undercover agent to flick on the outside lights to the home as a sign that there was no trap. FBI agents waited inside and spotted him when he pulled into the alley behind the home. Parked around the corner was U.S. Marshal Meadows, who was informed of Leal's approach and spotted him as he entered the alley. Leal was alerted when Marshal

---

[1] The facts are drawn from the Indictment, the parties' briefs, the hearing testimony, and the audio-recorded interview.

Meadows drove his unmarked vehicle behind him. Leal sped off, and Marshal Meadows stopped him about two blocks away. He wore a large, green tactical vest with a badge and "U.S. MARSHAL" written across the front and back. Another vehicle with two other law-enforcement officers—Agent Buiter and Officer Tomás—were also at the scene. They too wore "police vests." Each was armed.

Agent Buiter informed Leal that he was not under arrest and that he was stopped because of an ongoing investigation. Agent Buiter then asked Leal several questions:[2]

- whether Leal would be willing to go to a house nearby and speak with other agents;
- whether Leal would hand over his phone because it could contain evidence of criminal activity;
- whether Leal would hand over his keys so another officer could move his car off the street; and
- whether Leal would consent to a pat-down search.

Leal consented to each request; and Agent Buiter took his phone, keys, and wallet.

Marshal Meadows transported Leal to the sting house. Leal sat unrestrained, and they did not engage in conversation. When they arrived, Officer Jeske escorted Leal inside. They passed through the kitchen, where there were at least two other law-enforcement officers.[3] They eventually arrived at the "bedroom" on the first floor.

According to Agent Hart, the bedroom looked more like an interview room. Inside were a table, three chairs, and a computer. Sitting at the table were Agent Hart and another FBI agent. Leal's wallet and cell phone rested on the table—but his car keys were not there (they were not even in the house). Leal entered, and the door closed behind him. He consented to the interview

---

[2] Agent Buiter testified that he does not remember "the specific order that the events happened in."

[3] Agent Hart testified that the FBI agents are divided into two teams. The *surveillance team* is made up of six-to-eight agents, and the *inside team* is made up of another six-to-ten agents.

but did not receive a *Miranda* warning. Neither agent told him that he was free to leave. Because Agent Hart had never seen Leal before, he testified that he was unsure at the start of the interview whether they had the right person.

Less than two minutes into the interview, Leal admitted that he came to the area after "chatting with a younger male through the Grindr app." Five minutes later, he confessed that he came to "play[] around sexually" with a minor, even though he "totally knew . . . it was wrong from the very beginning." Agent Hart testified that at this point, Leal was not free to leave.

Agent Hart then read portions of Leal's conversation with the undercover agent aloud. Leal again admitted his intent to engage in sexual activity with a minor. Agent Hart then confirmed, "You understand what you did was illegal, correct?" And after a period of "casual" conversation about Leal's wife, children, and business, Agent Hart informed Leal that he would be arrested. Agent Hart testified that Leal seemed "deflated" at that moment.

In August 2019, a grand jury in the Southern District of Illinois charged Leal with Attempted Enticement of a Minor. Leal moved to suppress the audio-recorded interview, arguing that it is the fruit of an un-Mirandized *custodial interrogation* in violation of the Fifth Amendment. The Government responded and Leal replied. The Court also conducted an in-person hearing, during which it examined the interview; heard testimony from Agent Hart, Agent Buiter, and Marshal Meadows; and heard oral arguments.

## II.   LEGAL STANDARD

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege against self-incrimination "is fully applicable during a period of custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 460 (1964). So before conducting a *custodial interrogation*, law enforcement must advise suspects of their right to remain silent or

otherwise "insure that the statements were truly the product of free choice." *Id.* at 457. "[F]or at the heart of *Miranda* lies the notion that a suspect in custody does not necessarily have the choice to 'remain silent or make only such statements as serve his interest.'" Wayne R. LaFave, *"Street Encounters" and the Constitution:* Terry*,* Sibron*,* Peters*, and Beyond*, 67 Mich. L. Rev. 39, 112 (1968) (internal citation omitted).

"[A] person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda*, regardless of the nature or severity of the offense of which he is suspected or for which he is arrested." *Berkemer v. McCarty*, 468 U.S. 420, 434–35 (1984). And formal arrest is not the only way for a suspect to be *in custody*. Rather, a custodial interrogation may arise when the "potentiality for compulsion is forcefully apparent," *id.* and there is a "'restraint on freedom of movement' of the degree associated with formal arrest," *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "Moreover, custodial arrest thrusts an individual into 'an unfamiliar atmosphere' or 'an interrogation environment. . . created for no purpose other than to subjugate the individual to the will of his examiner.'" *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) (quoting *Miranda*, 384 U.S. at 456–67).

That said, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442.

> "[C]ustody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. And in order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the

> interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

*Howes v. Fields*, 565 U.S. 499, 508–509 (2012). The Seventh Circuit has listed further considerations:

- whether the interrogation occurred in a public place;
- whether the suspect consented to the interrogation;
- whether the suspect was informed that he was not under arrest and was free to leave;
- whether the suspect was moved to another area;
- whether there was a threatening presence of several officers;
- whether there was a display of weapons or physical force; and
- whether the officers' tone of voice was such that their requests were likely to be obeyed.

*United States v. Littledale*, 652 F.3d 689, 701 (7th Cir. 2011).

### III. ANALYSIS

Considering the totality of the circumstances, a reasonable person in Leal's position would not have felt free to leave at the start of the interview. The number of officers that Leal saw and interacted with; the incriminating messages that were read aloud to him; not having access to his phone, keys, or wallet; being interviewed in a closed-door room with two FBI agents in a police-controlled sting house—these are just a few clues that suggest that Leal did not think he could get up and walk out. A reasonable person in his position would conclude the same.

#### A. Location

*This factor favors suppression.* The interrogation occurred outside public purview, which supports suppression. Although Leal was stopped on a public street, he was relocated to a private residence maintained by the FBI, increasing coerciveness.

With that in mind, in *United States v. Patterson*, 826 F.3d 450, 459 (7th Cir. 2016), the Seventh Circuit concluded that a suspect was not *in custody* during an interrogation at an FBI

office. Agents approached the suspect at his driveway and informed him that he was under investigation for armed robbery. *Id.* at 452. He consented to an interview at a nearby office, where he confessed to the crime. *Id.* at 452–3. The suspect later argued that the confession should be suppressed because he did not receive a *Miranda* warning, and the Seventh Circuit disagreed. *Id.* at 455. The court gave "minimal weight" to the fact that the interview took place in a private space "considering the totality of circumstances." *Id.* at 457. It noted that the suspect consented to the interview at the office, never asked to get out of the agents' car, and never said anything to suggest involuntariness or an intention to stop cooperating. *Id.* at 457–58. His voluntariness overcame the fact that he was moved from his driveway to the office. *Id.* at 456. The agents also never drew weapons, used loud voices to compel compliance, or made threatening statements or gestures. *Id.* at 458. And even though the agents never told the suspect that he was not under arrest or that he was free to leave, those messages were *implied* because the suspect was not told otherwise or restrained. *Id.*

As in *Patterson*, this factor is given reduced weight given Leal's voluntariness. That said, *Patterson* is distinguishable. Agents approached an unsuspecting Patterson as he stood on his driveway in sight of passersby. Leal, however, was "caught in the act," making it less reasonable to think that he could turn his back on the officers. He was also not taken to an office building but to a sting house outfitted like a makeshift police station. The police-dominated atmosphere of the home was further revealed when Leal passed several officers in the kitchen and arrived at the interrogation room. The Court agrees that the location of the interrogation ultimately produced a potentiality for compulsion equivalent to station-house interrogation, conveying "a message that" Leal had "no choice but to submit to the officers' will and to confess." *Murphy*, 465 U.S. at 433 (citing *Miranda*, 384 U.S. at 456–57).

### B. Duration

*This factor is neutral.* A long interrogation may suggest that a suspect is *in custody*. *See generally* Wayne R. LaFave et al., 2 Criminal Procedure § 6.6(f) (4th ed. 2019) ("A court is more likely to find the situation custodial . . . when the questioning was lengthy rather than brief and routine."). *Cf. Allen v. United States*, 390 F.2d 476, 478–79 (D.C. Cir. 1968) ("We think that the relative routineness of an inquiry is a material indicator that the police are still in a state of investigation.") The interview here was brief, lasting less than 20 minutes. That said, the nature and circumstances surrounding the interview could hardly be considered routine questioning. The Court gives this factor little weight.

### C. Statements

*This factor favors suppression.* True enough, Leal voluntarily consented to every request, including handing over his keys; being pat down; and undergoing questioning. At no point did Leal tell Marshal Meadows that he wanted to get out of his vehicle; nor did he tell Agent Hart that he wanted to stop the interview. And although the agents did not explicitly tell Leal that he was free to go, neither did the agents in *Patterson*—yet the Seventh Circuit found this factor weighed *against* suppression because the message was implied. The same could be said here. Although the agents did not tell Leal that he was free to leave, he was not told otherwise (like in *Patterson*). Nor did they "use[] voices compelling compliance, such as yelling, using profanities, threatening arrest, etcetera." *Patterson*, 826 F.3d at 459.

That said, statements made during the interview by Leal and the law-enforcement officers highlight how a reasonable person would still not feel free to leave. For example, Leal confessed less than two minutes into the interview, suggesting that he did not think that he was going home a free man from the onset. The same would be true to a reasonable person in his position. And

although Agent Buiter told Leal during the traffic stop that he was not under arrest, Agent Hart was sure to clarify to Leal after he made incriminating statements that "You understand what you did was illegal, correct?" Yet Leal had stated before that he "totally knew . . . it was wrong from the very beginning." In fact, he already made that clear when he asked the undercover agent to flick the lights on—because Leal suspected that he could be arrested from the moment he arrived. What's more, "[c]onfronted with obvious evidence of [his] guilt," Leal "could reasonably have assumed that he would not be allowed to leave." *Miley v. United States*, 477 A.2d 720, 722 (D.C. Ct. App. 1984). A reasonable person under these circumstances would not feel free to break off the questioning.

### D. Restraints

*This factor favors suppression.* True enough, Leal was not handcuffed until after the interrogation. The agents also never used their weapons; nor is there evidence that weapons were flashed for intimidation. And like in *Patterson*, the agents "did not ambush him, yelling orders, in full uniform or SWAT-type fatigues with weapons drawn." *Id.* Even so, Leal spoke to at least four different law-enforcement officers and saw at least three others. A reasonable person in Leal's position would not believe that they were free to leave after seeing such a show of force. The door to the room where the interview took place was also shut; and Leal had neither his phone, his keys, nor his wallet. Though not physically confined, a reasonable person in Leal's position would still feel functionally barred from leaving.

### E. Release

*This factor favors suppression.* Leal was arrested after the interrogation (unlike in *Patterson*, where the suspect was let loose and not arrested until weeks later). This *could* suggest that a reasonable person would not have felt free to leave during the interview. That said, the Court

— 9 —

joins the majority of district courts that give this factor little weight, as it the least dispositive indicator of what someone might have thought before formal arrest. *See* LaFave et al., *supra*, § 6.6(c).

Considering the totality of the circumstances, a reasonable person in Leal's position would not have felt free to leave at any point during the interview. His confession was therefore elicited in violation of the Fifth Amendment and must be suppressed.

### IV.    CONCLUSION

The Court **GRANTS** Defendant Jorge Luis Leal's Motion to Suppress Statements.

**IT IS SO ORDERED.**

**Dated: Monday, August 31, 2020**

                                            **S/J. Phil Gilbert**
                                            **J. PHIL GILBERT**
                                            **UNITED STATES DISTRICT JUDGE**