UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA, )
)
Plaintiff, )
v. ) No. 4:19-cr-40069-JPG-1
)
JORGE LUIS LEAL, )
)
Defendant. )

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE REONA J. DALY
UNITED STATES MAGISTRATE JUDGE

March 31, 2020

APPEARANCES:

FOR PLAINTIFF: Thomas E. Leggans, Esq. (in person)
OFFICE OF U.S. ATTORNEY
402 West Main Street, Suite 2A
Benton, Illinois 62812
(618) 439-3808
thomas.leggans@usdoj.gov

FOR DEFENDANT: Stephen C. Williams, Esq. (video)
KUEHN, BEASLEY & YOUNG, PC
23 South 1st Street
Belleville, IL 62220
(618) 277-7260
swilliams@kuehnlawfirm.com

REPORTED BY: Christine Dohack LaBuwi, RDR, CRR
Official Court Reporter
301 West Main Street
Benton, Illinois 62812
(618) 439-7725
Christine_Dohack@ilsd.uscourts.gov

Proceedings recorded by mechanical stenography, produced by computer-aided transcription.

(Videoconference proceedings began at 11:00 a.m.)

THE CLERK: Case No. 19-40069, *United States of America versus Jorge Luis Leal*. Case is called for a motion hearing.

Are the parties ready?

MR. LEGGANS: Tom Leggans appearing on behalf of United States. Good morning, Your Honor.

THE COURT: Good morning. It's weird to see you over there.

MR. WILLIAMS: Good morning, Your Honor. Stephen Williams for the defendant, appearing by video conference. And also appearing by videoconference from the Williamson County jail is my client, Mr. Leal.

And we are prepared to consent to this hearing being conducted by videoconference.

THE COURT: Good morning. How are you?

THE DEFENDANT: Good morning.

MR. WILLIAMS: I'm doing well, thank you.

THE COURT: And, Mr. Leal, how are you, sir?

THE DEFENDANT: Doing well, thank you.

THE COURT: Can hear us okay?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. Tell you what, it's getting lonelier and lonelier in this courtroom.

Mr. Leal, we are here on your motion for

reconsideration of the detention order based on changed circumstance. And as I have noted, some of us are here and some of us are by video. The courthouse is currently closed to the public due to the COVID-19. The Federal Government has declared a state of emergency and the Governor of the State of Illinois has entered a stay home executive order. The CDC guidelines call for social distancing and no gatherings of groups greater than 10 people.

And based on all of this, the Southern District of Illinois -- which is where we are -- has issued several Administrative Orders, 261, 262 and now 263, which address closure of the courthouse and access to proceedings by the public and press. Currently, we have established a call-in number for those in the public and the press to listen in by telephone. They will be able to hear what is happening in the courtroom. But like being in the courtroom, they are not able to interject.

To the extent this is considered a closure of the court's proceedings, the Court finds there's an overriding interest in the public health that makes this closure essential, and participation by teleconference is narrowly tailored to serve that interest.

The Court has considered other alternatives, but they are not feasible at this time as the virus is being

passed asymptomatically. The Court continues to evaluate and address the situation as further information and technology becomes available.

Your attorney, sir, has filed this motion and consented in the motion to your participation by video. You have the right to participate in person, if you choose to do that, but I understand by your attorney's motion that you are consenting to do that by video. Is that your understanding, as well, sir?

THE DEFENDANT: That's correct.

THE COURT: Okay. And you are willing to waive any right that you have to participate in person?

THE DEFENDANT: Yes.

THE COURT: Okay. All right. So, we are here on your attorney's motion. I note the history of this case is that, originally, you were released on bond. There were some issues that arose and -- which resulted in a motion to revoke the bond by the Government. And in response to that, you filed a waiver of your detention hearing.

Mr. Williams, you are asking for the Court to make a different decision at this point. So, if you would like to proceed, you may do so.

MR. WILLIAMS: Thank you, Your Honor.

I'll really recap mostly what is in the written motion. There are three changed circumstances that the

defense asserts justify reconsideration of the previous consented order of detention.

First, we have a change of circumstance in that Mr. Leal does now have a suitable residence in the Southern District of Illinois, which was not the case, the Court is -- when his original detention order went in in September.

As the Court is aware, without me recounting all of the background, the main reason that he could not go back -- or did not have a residence is, he couldn't go back to Centerstone. And he wasn't welcome at his home at the time; still is not. So, without any other issues, he still didn't have a place to stay, and now he does.

In fact, there's two places to stay, but we're proposing the one in the Southern District of Illinois based upon, as I pointed out, a previous investigation in February noted a variety of concerns, one of which was the remoteness of his parents' residence from the Probation Office in the Western District of Tennessee. So, based on that, we endeavor to find a place here in the Southern District of Illinois.

A second changed circumstance that I didn't note as a changed circumstance, but it is discussed in the motion but I think also represents a significant change, is, there is no doubt that Mr. Leal presented a real suicide risk at the time he was detained. It appears that that risk has

dissipated. And as I have noted in the motion, while it is true that Mr. Leal was initially under suicide watch or what they call, in the Williamson County jail, "close watch," for barely over a week, from September 9th until September 17th, he has not been under any type of special watch of any kind since September 17th.

And so, he's been treated in all respects like any other prisoner. And in fact, there's been periods of time where he hasn't even had a cellmate, and he represents to me that there were at least two occasions extending over two weeks.

So, the fact that he's been off the suicide watch for that period of time, and treated with respect to housing as any other inmate, was verified as I said by Lieutenant Pinkerton at the Williamson County Jail.

So, we've got that additional significant circumstance. Because that appears to be the only reason that Probation was originally requesting that bond be revoked. It is the one reason that was listed in the Government's motion to revoke bond. And as far as I am aware, based upon e-mail communications with the pretrial office, it's the only reason that bond is currently being opposed.

And then the other changed circumstance has to do with the current virus that we're all dealing with and why

we're having this hearing by video. It goes -- while I cannot point to specific facts, as I said, with respect to the Williamson County Jail, it doesn't appear that there's been any outbreak even in Williamson County yet, at this point in time. But the risks associated with detained individuals for contracting the virus are well-documented.

I mean, the Cook County Jail is undergoing a crisis. The detention centers in New York are undergoing a crisis. It appears, so far as we can see, that the virus continues to spread despite what restrictions and admonishments have been put in place. That doesn't mean it will reach the Williamson County Jail, but it's a real risk, and I wouldn't be making the motion on that basis alone. I think the motion is sufficient, were it not for these issues. But I do think it is one additional point that, that bears mention.

And along with that goes the restrictions on my access to Mr. Leal, which are not -- they're not complete. In other words, I can still go and see him. Of course, by doing so, I'm putting myself at increased risk, as well as all of the guards and prisoners at the Williamson County Jail, if I'm bringing something in. Everybody there is being subjected to anyone who's newly introduced to that place.

There are restrictions on the manner in which I can

visit now with Jorge, and that means that it's going to be through glass, which, under normal circumstances there's no problem with that type of the visitation. But as I pointed out in the motion, we've got a motion to suppress hearing that's currently scheduled for April 8th. And what I said in the motion may or may not end up holding true because it's possible that that will be continued.

And so then the issue becomes -- I mean, you know, it's damned if you do, damned if you don't. Whether -- if we have the hearing under the current circumstances, we're going to be at the disadvantage of probably having to participate by video, having to meet in less than ideal circumstances that put individuals at increased risk. The alternative, which could very well happen today or tomorrow, is that -- I have no idea -- but the hearing could get continued. And in the meantime, a man is sitting detained with the presumption of innocence all the while waiting for his evidentiary hearing on an issue that's an important pretrial issue. So, it has the indirect impact, or direct impact, is the impact of delaying his speedy trial rights.

We understand, of course, the need for all of these measures being taken. But it only adds to the reasons why someone in his position, where the issue that related to and was the impetus for his being revoked or at least him

consenting to being revoked, have now dissipated.

So, what the Court has available to it, I'll put out there again, is electronic monitoring which he was on before. He can be ordered to participate in counseling. He does -- as was noted in the Pretrial Services report that Mr. Kielbach did provide to me this morning, and that was helpful because he -- it was noted that he didn't have a doctor that he was getting counseling from, but he does have the means if -- you know, given some suggestions, *Hey, who should I call?* -- getting that set up and paying for counseling. And so that is not an issue. He can be ordered to do that.

And not only can -- you know, and quite frankly, a lot of counselors, I'm aware, are doing counseling by video. They can do it by telephone. But -- and depending on the circumstance, they may be willing to meet with him in person. But these are all things that, you know, they're not, as far as I'm aware, they're not coming into the jail for this.

In addition to that, I'd note he had no violations. He was doing as advised. So, when he was revoked, he had been told, *Hey, if you attempt suicide again, you're probably going to be revoked.* Which was good advice; it probably was true. *So, reach out if you have a problem.*

Now, there may be a minimal factual dispute as to

whether -- it appears there is -- as to whether, in September, he actually said "I'm intending to commit suicide again" or "I'm having ideation and I'm depressed" because he had been -- had a recent visit from his wife after he got back to the hospital. I don't think that that's material though, Your Honor, but I did want to note that I recognize there may be a bit of a dispute over exactly how that went down. But the, the fact of the matter is, since that time there hasn't been any indication that there's been a problem. And in the seven months since then, presumably, it would have manifested itself by now. And it hasn't.

And in fact, his family, who spoke to the Probation Office in the Western District, indicated that their feeling was, he has a new outlook on life and is handling these -- you know, the stresses more appropriately. So -- he's also been provided medication which is proving apparently to be effective. He's still prescribed those two medications and he can continue to take those medications.

So, under all the circumstances, Your Honor, it seems as if we've got multiple changed circumstances, and the very reason -- the only reason that was advanced for detention has dissipated. And there are plenty of mechanisms that the Court can employ that would reasonably

assure the safety of the community and his appearance which, quite frankly, I don't think they're really even an issue.

The Government cited to a case from the Third Circuit that certainly recognizes that there -- suicide risk could be technically -- well, here's a -- we can consider whether he'll show up for court because if, you know, someone kills themselves, they can't show up for court. But it even questions whether or not that in and of itself, absent any other factors, is an appropriate reason to make someone sit detained when they're supposed to be afforded the presumption of innocence.

So, for those reasons, we're asking that the Court reconsider and grant Mr. Leal pretrial release with the appropriate conditions, Your Honor.

Thank you.

THE COURT: Thank you.

Mr. Leggans.

MR. LEGGANS: Your Honor, of the three changed circumstances -- of the three changed circumstances that counsel has made reference to, I think the, really the, from our perspective, anyway, the only one that matters is whether or not Mr. Leal is -- continues to be a suicide risk. So, I'll briefly address the other two.

With regard to whether or not there is a suitable

residence. It's my understanding that Probation has made at least a temporary investigation into that and they have concluded that there is a suitable residence. So, I don't believe that's an issue that the Court has to spend a particular -- a great amount of time on.

With the issue relating to the changed circumstance related to the COVID virus. I would note that there is no allegation that this defendant is, is suffering from any of the risk factors. And as this Court is aware from other motions that have been brought, the jails in the Southern District of Illinois have adopted procedures to adequately address the concerns that counsel raises. I'm not downplaying the concerns that he is raising. I just think that there are sufficient safeguards that all of the local institutions have put into place to make their facilities as safe or safer than what the public at large is.

The -- I believe there is one case in Williamson County at large, I think I have heard about, but there certainly have not been any cases attributed to the jail in Williamson County, which is where the defendant is housed.

The big issue for the Court's consideration is whether or not the defendant's a suicide risk. And I have conferred with Probation, and they are taking the position that they are concerned that he is still a suicide risk. The -- as this Court is aware, my custom and routine

practice is, whatever Probation recommends with regard to detention is what I go along with, because they are the ones who are responsible ultimately for the day-to-day well-being of the community and of this defendant.

The -- I will say this: I don't know -- and I will defer to counsel, if he does know -- I don't know that they have re-interviewed Mr. Leal. And I believe, for all of us -- and it's going to be true for the Court, too -- anyone who decides that he should be released is taking a leap of faith that he is not going to kill himself. And that is a leap of faith that Probation is not willing to make and, accordingly, it's not a leap of faith that I am willing to make.

But I recognize that if the Court decides to release Mr. Leal on conditions, that that's certainly within the Court's discretion. And if the Court is willing to make that leap of faith, it is one that I could certainly understand.

THE COURT: Thank you.

Any response?

MR. WILLIAMS: Two things, Your Honor. With respect to the issues surrounding the restrictions relating to COVID-19, I am certainly not asserting, as Mr. Leggans points out, that the Williamson County Jail isn't taking adequate measures. Those measures, in fact, though, make

it more difficult for me to represent Mr. Leal that -- that there's nothing we can do about while he's there.

The second thing is, in terms of taking a leap faith, if the -- you know, having concerns about a suicide attempt seven months ago, where there's been no manifestation whatsoever of any issue since then, I'm not saying it's illogical, one can have those concerns. And if you want to take the approach that, *If I have any concern at all, then the man needs to be detained*, well, that's Probation's prerogative to take that approach and I suppose it certainly eliminates any risk. But that's not what this is about.

There hasn't been a manifestation. Is it right to have somebody detained over -- for, at this point, we don't know how long until the case is going to be resolved -- when there hasn't been any manifestation in seven months' time? He maintains a presumption of risk -- or the presumption of innocence. And there are adequate measures the Court can impose to address all issues, to include a potential for a risk that existed seven months ago for which there's no evidence of a continued risk today.

You know, when Probation made its original recommendation, one of the primary reasons it cited to in its Memorandum was, he needs to be under suicide watch. Well, he was for a week, and he hasn't been since.

So, for under those circumstances, Judge, it just appears that continuing to detain him under the speculative view that he actually represents a risk, which we don't have evidence of that, would be improper.

Thank you.

THE COURT: Okay. Mr. Williams, what kind of care is he getting? What kind of psychiatric care is he getting right now, do you know?

MR. WILLIAMS: He's getting his medication. That's it.

THE COURT: And the medication is prescribed by who?

MR. WILLIAMS: The physician at the prison -- or, I'm sorry, at the jail. He's being prescribed Prozac and Lithium, which he can continue to get.

THE COURT: All right. I set this for a hearing, as Mr. Leggans sort of alluded to. I have had some other motions from other defendants with regard to the risks involved with the COVID-19 virus and I have, in those cases, not set them for hearing, finding that it wasn't a change in circumstances.

And I'm not inclined to find -- while I understand what you are saying about your lack of -- well, the difficulties imposed with regard to your visits with your client, at this point there is no evidence it's in the jail

and I'm not going to make any decision based on that.

I did specifically want to hear from the parties on this case because of your allegations with regard to the risk of suicide and that that risk has dissipated.

I, like everyone else, have consulted with Probation about their recommendation. I rely heavily on Probation because they have the experience in the field with these sorts of cases. And I understand it is my decision.

I saw Mr. Leal back in the fall, late summer/early fall of last year on a couple of occasions, and he was in bad shape. I think we would all agree to that. I am encouraged by the improvement or apparent improvement in his condition or his situation and his management of his psychiatric or mental health condition. That being said, this has been a tough road for Mr. Leal, to say the least.

He's had a lot of changes in his personal life, in his professional life, his financial life. And I am going to find that while circumstances are different, they have not changed enough to release him on bond. And I think, going back and looking at everything in his picture that we knew and that we know now, I think this is a case where we need to keep him detained at this point in time with regard to all of those factors that we have discussed, with regard to the virus as well as the suicide risk.

So, for those reasons, I will get you an Order, but the motion will be denied.

Thank you.

MR. LEGGANS: Thank you, Judge.

THE COURT: Anything else, counsel?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: All right. Thanks.

(Court adjourned at 11:29 a.m.)

REPORTER'S CERTIFICATE

I, Christine Dohack LaBuwi, RDR, CRR, Official Court Reporter for the U.S. District Court, Southern District of Illinois, do hereby certify that I reported with mechanical stenography the proceedings contained in pages 1-17; and that the same is a full, true, correct and complete transcript from the record of proceedings in the above-entitled matter.

DATED this 22nd day of August, 2022,

*s/Christine Dohack LaBuwi, RDR, CRR*
______________________________________
Christine Dohack LaBuwi, RDR, CRR